IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| MARK A. GARNES, #24646-053<br>Plaintiff, | * |
| | * |
| v. | CIVIL ACTION NO.  AW-04-3176 |
| | * |
| KATHLEEN HAWK, et al.,<br>Defendants. | * |

*******

## **MEMORANDUM**

On October 5, 2004, the instant complaint, filed by federal prisoner Mark A. Garnes, then incarcerated in the Federal Correctional Institution ("FCI") Cumberland, was transferred to this Court from the United States District Court for the District of Columbia. Paper No. 1. Plaintiff subsequently was granted leave to file an amended complaint. Paper No. 7. Plaintiff alleges that he has been: (1) denied the right to freely practice his religion; (2) denied access to the courts; (3) sexually assaulted by prison staff; and (4) retaliated against. *Id.* The case now is before the Court[1] on cross motions for summary judgment.[2] Paper Nos. 39 and 54. The parties each have filed

---

[1] Also pending before the Court is Plaintiff's Motion to Amend. Paper No. 50. The Motion is in reality a request for discovery and shall be denied. Local Rule 104.4. (D. Md. 2004).
   Plaintiff has also filed a second and third request for preliminary injunction. Paper Nos. 38 and 57. Plaintiff requests, respectively, that he be given adequate time in the law library to respond to Defendants' Motion for Summary Judgment and that his legal documents be secured in his transfer from FCI-Cumberland. In order to obtain injunctive relief under F. R. Civ. P. 65, Plaintiff must demonstrate: (i) the likelihood he will be irreparably harmed if the preliminary injunction is denied; (ii) the likelihood that Defendants will not be harmed if the requested relief is granted; (iii) the likelihood that Plaintiff will succeed on the merits; and (iv) that the public interest will be served if the injunction is granted. *Blackwelder Furniture Co. v. Selig Manufacturing Co.*, 550 F.2d 189, 195-96 (4th Cir. 1977); *Yakus v. United States*, 321 U.S. 414 (1944). Plaintiff's request for a injunctive relief shall be rejected in that his Motion does not clearly establish that immediate and irreparable injury, loss, or damage would result to him if the requested relief is not granted. Plaintiff has more than adequately responded to Defendants' dispositive motion. Paper Nos. 52 and 54. He already has been removed from FCI-Cumberland, and provides no credible information that his legal papers did not follow his transfer. Paper No. 58.

[2] To the extent Plaintiff's Motion for Summary Judgment contains additional allegations of constitutional violations newly raised therein and not raised in the original or amended complaint, those claims will not be considered. Fed. R.Civ. P. 15. Plaintiff is of course free to file a separate civil rights complaint regarding those allegations.

oppositions to the pending motions. Paper Nos. 52 and 56.  No hearing is needed to resolve the facts and issues presented in this case.  *See* Local Rule 105.6 (D. Md. 2004).

## I.  PLAINTIFF'S CLAIMS

**A.     Religious Claims:**

**1.      Participation in Certified Food Program:**

According to Plaintiff, he was received at FCI-Cumberland on August 5, 2002.  Paper No. 7. On August 6, 2002, he submitted an Inmate Request to the Chaplain Service to be placed on the Certified Food Program ("CFP") so that he would receive kosher meals.  Paper No. 1.  Plaintiff's request was approved: however, his name was not placed on the CFP meal roster.  Forty-five days later, after pursuing administrative remedies, Plaintiff was placed on the CFP meal roster.  *Id.*

On an unspecified date, Plaintiff states Defendant Reeves sent him to the back of the food line which caused him to be denied re-entry to the dining room and denied lunch.  Thereafter, Defendant Reeves instructed Plaintiff on how to wear his religious headgear, specifying that Plaintiff's ears were not to be covered by the headgear.  Plaintiff states that the actions of Defendant Reeves were in retaliation for a previous grievance Plaintiff had filed against Reeves.  *Id*.

In early January of 2003, Plaintiff was removed from the CFP after Defendant Schemerhorn claimed that Plaintiff had given his CFP meal to another inmate, in violation of CFP rules.  Plaintiff subsequently requested and was granted readmission to the CFP meal program.  He was denied kosher meals during his suspension from the program, which lasted approximately one month.  *Id*.

Plaintiff states on May 18, 2003, Defendant Bittinger removed him from the CFP in retaliation for Plaintiff having filed grievances against food service staff.  Plaintiff further alleges

2

that Defendant Bittinger entrapped him by directing Plaintiff to substitute a mainline item for a missing food item, a violation of CFP guidelines. *Id.*

On February 6, 2004, Plaintiff was again removed from the CFP. Plaintiff was reinstated to the meal program on April 20, 2004, but did not receive notice of his reinstatement until April 24 or 25, 2004. On May 6 or 7, 2004, he was again removed from the CFP program because he missed six consecutive meals. Plaintiff states that he missed meals because he did not receive timely notice that his participation in the program had been reinstated. *Id.* Plaintiff states that Defendants McGorty, Smith, Schiffer, Pyatt, Thrasher, Bittinger and Reeves conspired to insure Plaintiff's removal from the CFP. *Id.* As evidence of the conspiracy, Plaintiff points to the delay in his being removed from the program for missing the six consecutive meals and the delay in his receiving notification that he was reinstated to the program.

   2.   **Food and Tray handling:**

On December 4, 2002, Plaintiff submitted grievances regarding the CFP meals. Plaintiff complained that food items were missing from his meals: thus, the meals did not meet the recommended daily caloric intake level. Plaintiff states that Defendant Servoss served non-kosher meals when kosher entrees had not been received. On several occasions CFP entrees were spoiled.

Plaintiff also complained that the CFP food trays were washed with general population trays. *Id.* Plaintiff verbally complained about the failure of servers to wear protective gear. Defendants Reeves, Most, Servoss, Pyatt, Bittinger, Thrasher, Schemerhorn, Schiffer, and Smith allegedly have violated policies for wearing plastic gloves when handling CFP meals, utensils, dishes and trays. Plaintiff also states that staff chew tobacco and expectorate while serving CFP meals and that inmates who serve on the food line handle non-kosher and kosher foods without discarding the

3

plastic gloves or without wearing gloves. *Id.* Plaintiff states that the "Food Service Defendants herewith Chaplain Maloney and Locus are retaliatory for the filing of grievances and verbal complaints relevant to the violations incurred by ignoring the dietary protections...." He further alleges that Defendants Hawk, Lappin, Shearin, Dewalt and Ausborn contributed to the actions of the other defendants by not conducting an inquiry into his complaints. *Id.*

### 3. Passover

Plaintiff states that during Passover in 2003 and 2004, items consistent with Passover were not provided by Food Service nor provided by the Chaplain Service. *Id.*

### 4. Failure to Provide CFP meals

An emergency lock down occurred approximately eighty days between September 22, 2003 and September 30, 2003. Plaintiff complains that during this time CFP meals were not distributed from September 23 to 25, 2003, and that no breakfast CFP meal was given on September 26, 2003, and no hot entree was provided at the September 26, 2003, evening meal. Plaintiff also states that no fruit or vegetables were given as a substitute for the missing meals. *Id.*

### 5. Religious Headgear

Plaintiff states that he was prohibited from wearing religious headgear of his choosing, a "tam and crown." He also states that Defendant Cosgrove presumed Plaintiff was Muslim and "ignited assaults" upon Plaintiff. Plaintiff also states that Cosgrove attempted to humiliate him by asking about Plaintiff's sexual preference. *Id.*

**B.     Failure to Protect/Assault Claim**

4

On January, 23, 2003, Defendant Cosgrove, while searching Plaintiff, allegedly fondled or groped Plaintiff's scrotum and groin. *Id.*

**C.     Access to Courts Claim**

A mail package submitted to Lori Sines was never received at its intended destination. Plaintiff appears to allege that Sines intentionally destroyed or lost Plaintiff's property, which included Plaintiff's transcripts. *Id.*

Plaintiff also alleges that Defendant Booth tampered with certified mail. As evidence of tampering, Plaintiff notes that his certified mail was logged as having been sent on Saturday, December 20, 2003. He states that certified mail is not sent on the weekend or holidays.

Plaintiff states that he has been denied access to courts in that he is not permitted to possess a copy of his presentence report, which is necessary for him to challenge his underlying conviction and sentence. *Id.*

**D.     Administrative Remedies**

Plaintiff claims that in late December of 2002, early January of 2003, no forms were available in the institution for submitting administrative remedies. Ultimately, when forms for submitting ARPs became available, the submitted ARPs were rejected as untimely.

Plaintiff also states that: other ARPs concerning the September, 2003 emergency lock down; ARP regarding the lost mail/package; and ARPs regarding to religious meals were rejected as untimely. *Id.*

**E.     Retaliation**

Plaintiff states that on June 4, 2002, Correctional Officer Smith of FCI-Elkton groped Plaintiff's genitals. Plaintiff states that his transfer to FCI Cumberland, a medium security facility,

was in retaliation for his having filed a grievance against Defendant Smith. He states that Defendant Bernzolli handled the investigation regarding this incident and failed to disclose the results of the investigation to Plaintiff. *Id.*

He also claims that his work reassignment from food service labor PM to dining food service dining hall PM was retaliatory and hindered his religious prayers. He further alleges that he was not provided rubber boots which were necessary to insure his safety. *Id.*

## II. STANDARD OF REVIEW

In order to survive a defendant's properly supported motion for summary judgment, a plaintiff is required to produce some evidence to support each of his constitutional claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Where all of the materials before the court indicate that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 322. While the facts and all reasonable inferences drawn therefrom must be viewed in a light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Only disputed issues of material fact will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### III. OTHER THRESHOLD ISSUES

The Prison Litigation Reform Act ("PLRA") generally requires a prisoner plaintiff to exhaust administrative remedies before filing suit in federal court. Title 42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The Supreme Court has interpreted the language of this provision broadly, holding that the phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Thus, the exhaustion provision plainly extends to each of Plaintiff's claims.

Plaintiff is a "prisoner" within the meaning of 42 U.S.C. § 1997e(a) and subject to the PLRA's exhaustion requirement. His claims must be dismissed unless he can show that he has satisfied the administrative exhaustion requirement under the PLRA, or that Defendants have forfeited their right to raise non-exhaustion as a defense. *See Chase v. Peay*, 286 F.Supp.2d 523, 528 (D.Md. 2003).

The PLRA's exhaustion requirement is designed so that prisoners pursue administrative grievances until they receive a final denial of the claims, appealing through all available stages in the administrative process. *Chase*, 582 F.Supp.2d at 530; *Gibbs v. Bureau of Prisons*, 986 F.Supp. 941, 943-44 (D.Md. 1997) (dismissing a federal prisoner's lawsuit for failure to exhaust, where prisoner did not appeal his administrative claim through all four stages of the BOP's grievance process); *Booth v. Churner*, 532 U.S. 731, 735 (2001) (affirming dismissal of prisoner's claim for failure to exhaust where he "never sought intermediate or full administrative review after prison

authority denied relief"); *Thomas v. Woolum*, 337 F.3d 720, 726 (6th Cir. 2003) (noting that a prisoner must appeal administrative rulings "to the highest possible administrative level"); *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002) (prisoner must follow all administrative steps to meet the exhaustion requirement, but need not seek judicial review).

It is clear that the Bureau of Prisons' four step process for resolution of prisoner complaints could be used to resolve the underlying disputes in a case such as this. *See* 28 C.F.R. §542.10 and §542.12. Initially a prisoner must attempt to informally resolve his complaint with staff. 28 C.F.R. § 542.13(a). If attempts at informal resolution are unsuccessful he may file a written complaint to the warden[3] on a prescribed form. This must be done within fifteen days of the incident giving rise to the complaint unless the prisoner can demonstrate a valid reason for delay. 28 C.F.R. § 542.13(b). In an emergency situation where the prisoner's health or welfare is threatened, the warden must respond within 48 hours of receipt of the complaint. Otherwise he has fifteen days from the date the complaint is filed.[4] These deadlines may be extended once by the amount of time originally allowed for a response. 28 C.F.R. § 542.14.

If the prisoner is not satisfied with the warden's response, he may appeal to the Regional Director. This must be done within twenty days from the date of the warden's decision. 28 C.F.R. §542.15. The Regional Director must respond within thirty days from the date the appeal is filed. This time may be extended by an additional thirty days. 28 C.F.R. § 542.14.

---

[3] If a prisoner believes that he would be adversely affected if his complaint became known at the institution where he is housed, he may file his complaint directly to the Regional Director. 28 C.F.R. § 542.13(c).

[4] A complaint is considered filed when a receipt is issued for it. 28 C.F.R. § 542.14.

8

Finally, if the prisoner is not satisfied with the response of the Regional Director he may appeal to the Office of General Counsel. This must be done within thirty days from the date of the Regional Director's response. 28 C.F.R. § 542.15. The General Counsel must respond within thirty days from the date the appeal is filed. This time may be extended by an additional thirty days. 28 C.F.R. § 542.14.

The uncontroverted evidence shows that from August of 2002 until June of 2004, Plaintiff filed 129 Administrative Remedies. Of those, Plaintiff completed administrative review on all levels of the BOP's program for administrative review in only the following fourteen cases:

- A. Remedy #275142 requesting transfer to lower security institution and MGTV removed;
- B. Remedy #277819 alleging placed on CFP in untimely fashion;
- C. Remedy #281941 challenging policy on possession of PSR;
- D. Remedy #281942 requesting copies of filed attempts at informal resolution;
- E. Remedy #283381 claiming retaliation when ordered to back of food line by staff and was denied CFP meal;
- F. Remedy #284692 alleging random search by staff member due to discrimination;
- G. Remedy #284692 alleging retaliation by staff member for filing grievances by making him remove his religious headgear;
- H. Remedy #285406 alleging non-kosher food substituted for kosher food;
- I. Remedy #3080687 requesting transfer to lower security institution and MGTV removed;
- J. Remedy #326030 alleging staff delay delivery of outgoing mail;
- K. Remedy #324968 alleging denial of CFP evening meal on 2/6/04 and morning and noon meals on 2/7/04 in retaliation for filing grievances;
- L. Remedy #334417 alleging racial tension due to cell assignment process;
- M. Remedy #334423 alleging white inmates given greater consideration in cell assignments; and
- N. Remedy #334414 alleging denial of commissary privileges.

Paper No. 39, Ex. 1, Attachments C-P.

Throughout these fourteen remedies, Plaintiff named only eight of the Defendants named in the instant Complaint. Further, only nine of the exhausted remedies correspond to issues raised

9

before the Court.[5] Specifically, Plaintiff has failed to exhaust remedies against Defendants Hawk-Sawyer, Lappin, Dewalt, Ausborn, Bittinger, Pyatt, Schemerhorn, Schiffer, Thrasher, Smith, Locus, Clifton, Shrewbridge, Hart, Holler, Sines, Pugh, Bogdan, Bernzolli, Booth, and Walker. *Id*. Additionally, claims which Plaintiff exhausted against Defendants McGorty, Most, Cosgrove, and Ezekiel do not correspond to the claims raised in the Complaint. *Id.* Accordingly, the foregoing Defendants shall be dismissed from this case and Plaintiff's unexhausted claims shall be dismissed without prejudice for failure to exhaust administrative remedies.

## IV. CLAIMS PROPERLY BEFORE THIS COURT

**A.     Access to the Courts**

Plaintiff alleges that the loss of his property mailed from the facility which included his transcripts, the BOP policy prohibiting him from possessing his Pre-Sentence Reports ("PSR"), and the denial of his request for copies of his Attempts at Informal Resolution, violated his right to access the courts. Paper No. 7.

To state a constitutional claim for denial of access to the courts, a prisoner must show that the alleged shortcomings "hindered his efforts to pursue a legal claim."*Lewis v. Casey*, 518 U.S.343, at 351 (1996). Prisoners are entitled to "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Bounds v. Smith*, 430 U.S. 817, 825 (1977); *Hudspeth v. Figgins*, 584 F.2d 1347 (4th Cir. 1978). In *Lewis v. Casey*, the Supreme Court clarified the *Bounds* decision by finding that a deprivation of a prisoner's right of access to the courts

---

[5]Plaintiff concedes that his other claims are unexhausted. In response to Defendants' dispositive motion, Plaintiff has requested an extension of time so that he may exhaust his administrative remedies as to these complaints. Paper No. 49. Plaintiff's request shall be denied. Plaintiff is free to file a separate complaint after exhaustion of his administrative remedies. Plaintiff is advised that pursuant to Fed. R. Civ. Pro. 8(a), he must set out his complaint in a short and plain statement of facts. Omnibus complaints such as filed in the instant case will not be accepted.

is actionable, but only where the prisoner is able to demonstrate actual injury from such deprivation. *Lewis*, 518 U.S. at 349. The actual injury requirement, however, is not satisfied by just any type of frustrated legal claim. *Id*. at 354. Rather, the *Lewis* Court concluded that *Bounds v. Smith*, *supra*, stood essentially for the proposition that prisoners are not guaranteed the ability to litigate every imaginable claim they can perceive, but that they have the tools necessary "in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." *Id***.** at 354.

Plaintiff has advised of no actual injury or specific harm which he has suffered as a result of the alleged delay in his legal mail, inability to possess his PSR, and denial of copies of his Attempts at Informal Resolution. The only evidence Plaintiff offers of injury are conclusory statements that the delay in his mail, inability to physically possess the PSR,[6] and denial of copies of his Attempts at Informal Resolution "impedes, hinders, and denies [his] access to the courts." Paper No. 7. Without greater specificity, Plaintiff's claims fail.

**B.     Retaliation**

Plaintiff alleges several instances of retaliation. Generally, claims of retaliation are to be treated with skepticism. *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996). In order to sustain a claim based on retaliation, a prisoner "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice***,** 40 F.3d 72, 75 (4th Cir. 1994). Moreover, in a retaliation claim, the plaintiff

---

[6]Bureau of Prisons Program Statement 1351.05 prohibits inmates from obtaining and possessing photocopies of their PSR. The policy was implemented to protect inmates from being coerced by other inmates to produce their PSR for illicit purposes. Inmates are able to access the information contained in the documents by contacting their unit team. Inmates are also able to attach copies of the PSR to papers filed in court by submitting a request on forms which are made available in the law library and housing units. Paper No. 39, Ex. 1, Attachment F, Q.

must show that the retaliation was the actual motivating factor. *Huang v. Board of Governors,* 902 F.2d 1134, 1140 (4th Cir. 1990).

Plaintiff states that Defendant Reeves retaliated against him for filing a grievance against her. Plaintiff states that Defendant Reeves "dictated the manner in which Plaintiff's religious headgear [was] to be worn" and caused Plaintiff to miss a CFP meal when she ordered him to the back of the line. Paper No. 7. The uncontroverted records, however, reveal that Plaintiff as a member of the Jewish faith and pursuant to BOP policy is only permitted to wear a yarmulke as a religious head covering. Paper No. 39, Ex. 2, Attachment B. Defendant Reeves' request for him to remove unauthorized headgear and/or to wear his head covering in such a way so that she could see more of Plaintiff's head are valid exercises of her authority. Paper No. 39, Ex. 1, Attachment I. If Plaintiff believes that he should be permitted to wear other head coverings, he must utilize the appropriate administrative procedure. At the time of the incident Defendant Reeves was simply enforcing BOP policy.

Likewise, when Defendant Reeves ordered Plaintiff to the back of the line she was maintaining order in the cafeteria where she perceived Plaintiff was causing disorder by walking past approximately fifteen other inmates who were waiting in line for their meals. Paper No. 39, Ex. 1, Attachment G. Plaintiff takes great issue with the fact that he missed his meal that day. He states that when he was forced to the end of the line, he was required to pass through the food service scanning device again. Since he had already been scanned and therefore registered for the meal, the scanning device barred his reentry into the cafeteria. Paper No. 54. That Plaintiff missed his noon meal by being forced to the end of the line, an apparently unintentional result of Defendant Reeves maintaining order in the cafeteria, is of no moment. Defendant Reeves was simply enforcing BOP

12

policy and as such her actions do not support Plaintiff's claim that she acted in retaliation for his having filed grievances against her. Plaintiff has failed to demonstrate a causal relationship between the filing of the grievance against Defendant Reeves and Defendant Reeves's action.

Plaintiff further alleges that Food Service staff retaliated against him for filing grievances by denying him his CFP meals on February 6 and 7, 2004, and that Defendant Servoss retaliated against him by serving non-kosher food "when the warehouse had not received any kosher entrees." Paper No. 7. Defendants concede that Plaintiff was removed from the CFP list from February 6 to 7, 2004. Paper No. 39, Ex. 2, Attachment M. The removal was the result of an administrative oversight. Plaintiff has presented no evidence to support his claim that removal from the list was retaliatory or that he suffered actual injury as a result. Additionally, all inmates receiving kosher meals were informed on November 21, 2002, that Common Fare hot entrees had not been delivered to the institution and that kosher sardines would be substituted for the meat portion of the kosher meals. *Id.*, Ex. 3, Attachment A. The substitution of the food item was not motivated by Plaintiff's having filed administrative remedies, but rather was due to the failure of an independent provider to deliver the meals to the institution.       Lastly, Plaintiff claims that he was transferred to FCI Cumberland in retaliation for having filed a grievance against a correctional officer at FCI-Elkton. Paper No. 7. Plaintiff received a Greater Security Management Variable "MGTV" based on the belief that Plaintiff was suspected of behavior that posed a threat to the safety and security of the institution to which he had been designated. This activity included escape plots, threatening other inmates, insolence toward staff, and organizing an unauthorized religious service. Paper No. 39, Ex. 1, Attachments C and L, Ex. 4. It was determined that Plaintiff required greater security than afforded at a minimum or low security institution such as FCI-Elkton, a rationale wholly unrelated

13

to Plaintiff's having filed a grievance against a correctional officer. Plaintiff has produced no evidence that the transfer was in retaliation for his having filed an ARP or was an effort to deprive him of the opportunity to practice his faith. Rather, he has simply made a bald allegation that the transfer was retaliatory in nature.[7] This is insufficient.

To the extent Plaintiff's complaint can be construed as alleging a deprivation of his due process rights in his transfer from FCI-Elkton to FCI-Cumberland, his claim shall be denied. In order to be entitled to the protections of the Due Process Clause, a constitutionally protected interest must be at stake. The Constitution does not entitle a prisoner to be held in any particular prison. *See Montayne v. Haynes*, 427 U. S. 236, 243 (1976); *Meachum v. Fano*, 427 U. S. 215, 224 (1976).

### C.     Delay in Participation in CFP

Plaintiff alleges that it took over forty-five days to have him placed on the CFP roster. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Pell v. Procunier*, 417 U.S. 817, 823 (1974). This concern, however, must be balanced against the constitutional rights of inmates which are not stripped away at the prison gate. *See Johnson v. Avery*, 393 U.S. 483, 486 (1969). Inmates retain the right to exercise their religious beliefs. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987). In determining whether prison rules and regulations pass constitutional muster, courts apply a lesser standard of scrutiny when reviewing alleged violations of protected rights out of deference to the complexities of prison administration, with which federal courts are not adept at dealing. *See Turner*

---

[7] Plaintiff states that he was not found guilty of any rule infractions while housed at FCI-Elkton. Whether Plaintiff was adjudicated guilty of a rule infraction is immaterial to the instant action. The relevance of the MGTV is to demonstrate that correctional officials believed Plaintiff was a threat to the orderly administration of the prison, required greater supervision, and should be transferred.

*v. Safley*, 482 U.S. 78, 81 (1987). Under *Turner*, an action by prison officials that infringes upon a prisoner's First Amendment rights is valid if it is reasonably related to legitimate penological interests. *Id.* at 89. The factors to consider include: (1) whether there is a rational relationship between the regulation and the legitimate government interests asserted; (2) whether there are alternative means of exercising the right in question that remain available to prisoners; (3) the impact accommodation of the asserted constitutional right would have on guards and other inmates and on the allocation of prison resources; and (4) whether ready alternatives exist which accommodate the right and satisfy the governmental interest. *Id.* at 89-90. A prison need only make "reasonable efforts" to accommodate a prisoner's opportunity to practice his faith. *See Alston v. DeBruyn*, 13 F.3d 1036, 1039 (7th Cir. 1994). Additionally, "[i]f the law makes no distinction between actions based on religious conviction and action based on secular views, it is a generally applicable law, neutral toward religion and not violative of the First Amendment." *Hines v. South Carolina Dept. of Corrections,* 148 F.3rd 353, 357 (4th Cir. 1998).

The BOP provides prisoners who request a religious diet an opportunity to observe religious dietary practices. Paper No. 39, Ex. 2, Attachment A. The prisoner must provide a written statement of the motivation for participation in the religious diet program and must be approved by the Chaplain for participation. The religious diet program consists of two distinct parts: religious dietary needs may be met through self-selection from the main line; and the second component accommodates religious dietary needs through nationally recognized, religious certified processed foods. Those who desire to participate in the religious diet program must make a written request to the chaplain who will interview the prisoner, normally within two days of receipt of the request. After a prisoner is approved to participate in the religious diet program, the Chaplain adds him to

15

the SENTRY religious diet participation list, usually within 24 hours. Thereafter, normally, Food Service will begin serving the approved prisoner within two days of notification that he was approved and added to the SENTRY list. Paper No. 39, Ex. 2. Those who keep kosher may self-select their meal from the Food Services' salad bar which provides salad and fruit that meets the requirements of a kosher diet. *Id*. and Ex. 3.

Declarations attached to Defendants' Motion for Summary Judgment demonstrate that Plaintiff was approved for CFP status on August 9, 2002, and added to the Food Services roster on Monday, August 12, 2002, in compliance with pertinent BOP policy. Plaintiff states that while he was approved for participation in the CFP program and his approval was noted in the SENTRY system, his name was not added to the Food Services roster and he was therefore denied participation in the CFP for forty-five days. While clearly this is a fact in dispute, Plaintiff's participation in the CFP is immaterial, because under BOP policy Plaintiff was able to self-select meals to accommodate his religious dietary needs through the main line salad bar. As such, even if Plaintiff were denied participation in CFP in that he did not have access to nationally-recognized, religiously-certified processed foods, his right to freely exercise his religion was not impaired, because he was able to meet his dietary needs through self-section from FCI's salad bar. Paper No. 39, Ex. 2.

## V.  CONCLUSION

In light of the foregoing, a separate Order shall be entered: dismissing Plaintiff's Complaint without prejudice as to Defendants Hawk-Sawyer, Lappin, Dewalt, Ausborn, Bittinger, Pyatt, Schemerhorn, Schiffer, Thrasher, Smith, Locus, Clifton, Shrewbridge, Hart, Holler, Sines, Pugh, Bogdan, Bernzolli, Booth, Walker, McGorty, Most, Cosgrove, and Ezekiel; granting Defendants'

Motion for Summary Judgment; and entering judgment in favor of Defendants Shearin, Servoss, Reeves and Maloney and against Plaintiff.


September 21, 2005                               _____"s"_____
   Date                                                   Alexander Williams, Jr.
                                                           United States District Judge